CINEMA PATENTS CO., Inc., v. WARNER BROS. PICTURES, Inc.

No. 372.

Circuit Court of Appeals, Second Circuit.
Sept. 12, 1933.

Kiddle, Margeson & Hornidge, of New York City (Henry T. Hornidge, William J. Dowd, and Herbert A. Huebner, all of New York City, of counsel), for appellant.

Samuel E. Darby, Jr., of New York City (William E. Beatty, of Los Angeles, Cal., of counsel), for appellee.

Before MANTON, SWAN, and CHASE, Circuit Judges.

SWAN, Circuit Judge.

The patents in suit relate to machine processing of motion picture film. Processing a photographic film involves the steps of developing, fixing, washing, and drying. Although additional steps, such as coloring, or hardening with alum, may be introduced, the present case is concerned only with the four first mentioned. Originally each step was performed manually. The exposed but undeveloped photographic film was cut into sections of about 200 feet in length, and each section was wound upon a rack or drum which

was submerged successively in the developing, fixing, and washing baths, and then hung in the drying room. Thereafter the sections were spliced together into a single reel of film of approximately 1,000 feet in length. This method was likely to result in variations in the quality of the picture due to variations in the degree of development of the several sections, and to produce scratches upon the film due to handling. When sound came to be used with moving pictures, the splicing of the sound track produced an additional objection as the splice causes an undesirable noise. By the method of machine processing, the exposed but undeveloped film is introduced at one end of the apparatus, mechanically advanced through successive receptacles containing appropriate chemicals or water, then through the drying chamber, and finally is delivered at the other end wound on a reel and ready for use. The sensatized face of the film is kept out of contact with the rollers which advance it through the apparatus, no manual handling or cutting and splicing is required, and the development may be to a uniform and predetermined density by regulating the speed of movement of the film and the depth of its submergence in the several baths.

Gaumont's first patent, No. 1,177,697, relates to means for developing, fixing, and washing the film—the so-called "wet end" of the treatment. It claims both the process and the apparatus described in the specifications. The second patent, No. 1,209,696, relates to the dry end of the treatment; that is, to means for drying the film after it has passed through the steps of wet processing. The claims are directed only to the structure of the drying apparatus. Originally the subject-matter of both patents was included in a single application filed February 17, 1909, but the second patent was issued on a divisional application filed July 22, 1915.

The apparatus described in the first patent consists of a series of deep tanks or receptacles containing developer, rinse water, fixing solution, and washing water in the order named. For each tank there is a removable frame which fits over the top of the tank and supports within it two parallel shafts, one above the other, each carrying a row of spools or rollers. The spread between the upper and lower shafts of rollers is adjustable. Located above the upper row of rollers is a sprocket spool keyed to an independent shaft which is rotated by an electric motor. The teeth of the sprocket spool engage perforations in the margin of the film and thus cause the film to move forward. It travels over the upper and lower rollers in a spiral path transversely across the developer tank until it reaches a sprocket on the other side of the frame. Thence the film is led over an idler roller into a tubular-shaped, rinsing receptacle into which it dips in the form of a skewed loop in which floats a roller; thence it passes over another idler roller to the first sprocket for the tank containing fixing solution, through which it travels in like manner as in the developer tank but in an opposite direction of travel. Thence it is passed in similar manner through the final washing tank. The film is started with the emulsion surface outermost, and by reason of its spiral path over upper and lower rollers the emulsion surface remains out of contact with the rollers and the sprockets as it moves forward. Because of the torsional strain resulting from its spiral path, Gaumont prescribes preferably spherical shaped rollers. When the film makes a single loop, as in the rinsing tube, it is given a twist so that the emulsion side will remain outermost as it goes around the lower spool, and it is twisted back again coming up. A reservoir is provided for storing the developing solution which is fed by gravity to the developing tank, and a constant circulation between reservoir and tank is maintained by a centrifugal pump. To regulate the temperature of the developer there is located in the reservoir a coil of pipe through which hot or cold water may be circulated.

After the film has passed through the final washing tank employed in the wet end of the treatment, it continues its travel to the drying apparatus of the second patent. This consists of a drying cabinet partitioned into compartments into which conditioned air may be admitted while the film is passing through. Its travel through is accomplished by means of a sprocket spool and upper and lower shafts of rollers, similar to the arrangement in the wet end of the apparatus, and it takes a similar spiral path from side to side across the cabinet. The sprocket is rotated by the same electric motor that drives the sprockets of the wet end. To obviate the strain resulting from shrinking of the film during drying, the lower shaft of rollers is permitted a limited up and down movement and is suspended in the loops of the film. Should the film break, this shaft will fall and thus complete an electrical circuit which sounds a signal and stops the motor that drives both the wet and dry ends of the apparatus. Before entry into the drying cabinet the film passes over rollers supported on the outside thereof, and is formed into a skewed loop in the bight of which rests a weighted roller; the purpose of

this loop being stated to be to "compensate for any ordinary irregularities in the speed imparted by the several driving devices and thereby avoid such tension upon the film or print as might tend to rupture it."

In the court below the patents were held valid, but the claims in suit were accorded so narrow a range of equivalents that the defendant was held to escape infringement. As an alternative ground of decision, the District Court's opinion states that the plaintiff, or its predecessors in title, had been guilty of such laches as to bar relief even if there were infringement, but the ruling as to noninfringement presents the principal question raised by this appeal and, if correct, makes unnecessary the consideration of other questions.

The machine used by the defendant is described in detail in the opinion below and that description need not be repeated here. It will suffice to refer to important differences between it and the patented apparatus. In the defendant's machine the film is advanced in a "straight through" fashion; it takes no spiral path across the tanks. The tanks are tubular receptacles each of which contains but a single loop of film in the bight of which floats a roller. Two rollers are mounted fixedly at the top of each tube; one is an idle spool, the other a power driven sprocket. The film enters the tube over the idle spool and is drawn out over the sprocket. There is no removable frame for each tank or tube, but all the upper rollers are mounted on studs of a single beam extending the length of the machine. The lower rollers are not mounted at all, but each is suspended in the bight of a loop of film. There are two electric motors, one driving the sprockets in the tank or tube section, the other those in the drier, and by reason of an "elevator" which accumulates a quantity of film between the two sections, a breakage of the film may occur in the drier thereby stopping the operation of that section, without affecting the continued operation of the tank section. The rollers and sprockets have a recessed surface so that they may ride on the margins of the film without coming into contact with its emulsion face even when that side of the film is toward the rollers. Sometimes, however, the film is threaded with the emulsion face outermost and the loops are skewed so as to maintain that relationship. To regulate the temperature of the developer, it is drawn through a coil in a tank into which either warm or cold water is led by a hose manually operated to keep the temperature of the tank constant.

In the drier, as in the wet end, the film goes "straight through" and has no spiral motion. There is one sprocket in each compartment at the outgoing end. The other upper spools are smooth. The lower spools are mounted upon a single bar and are all free to move up and down in the loops of the film.

While the defendant's machine accomplishes the same result as do the machines of the patents in suit, it is apparent that there are differences in the combinations of means employed respectively to effect this result. Whether one should be deemed the equivalent of the other will turn upon how fundamental was the patentee's contribution to the art. The trial judge concluded that his contribution was by no means fundamental. With this we agree.

The many prior patents contained in the record are adequately summarized in the opinion below. While no one of them shows the identical combination of elements of the patents in suit, they make clear that Gaumont's contribution had to do with details of the apparatus rather than with any fundamental new idea. The commercial success claimed by the plaintiff was found by the District Court to have resulted from other patents not in suit which the plaintiff had included in its grants of licenses. In this finding we concur.

Claim 1 of the first patent is for the process, and is the only process claim. It reads as follows: "1. The herein described improved process of treating photographic films or prints, which consists in moving such films or prints endwise over suitable supporting means, and during such movement, and at different points in the travel of such films or prints, subjecting the films or prints successively to the action of developing and fixing means, and maintaining the emulsion surfaces of the films or prints at all times out of contact with the supporting means, and assuring a desired action of the developing means by regulation of the temperature thereof." The claimed process includes four essential steps: (1) Moving the film "endwise" over suitable supporting means; (2) subjecting the film successively to developing and fixing solutions; (3) keeping the emulsion surface out of contact with the supporting means; and (4) regulating the temperature of the developer. Viewed broadly and without reference to the particular apparatus described in the patent for practising the process, each of these steps was old. In 1894 patent No. 525,849 to Mackusick was granted for an apparatus which mechanically advanced a long photographic paper band

through developing, fixing, and washing tanks. Numerous other patents prior to Gaumont disclose the same idea. So does the British patent to Hepworth, No. 13,315, May 20, 1899, which relates specifically to motion picture film. The latter also teaches the idea of keeping the emulsion surface out of contact with the supporting means, Hepworth's method being to recess or undercut the rollers. Obtaining this result by passing a sensatized film, while drying, in a spiral path over upper and lower rollers, is disclosed in patent No. 676,314 to Hearson. The fourth essential, namely, regulating the temperature of the developer, was known to be necessary from early days of the photographic art, and is disclosed in patent No. 630,500 to Graeme and British patent No. 22,456 of 1907 to Watkins. It is apparent, therefore, that Gaumont contributed no broadly new process. If his process claim is to be held valid as an invention, it must be limited to a process practised in the way and by means of the combination of instrumentalities which he discloses. The distinctive feature of his movement of the film over suitable supporting means—whether or not "endwise" means lengthwise of the film— is its spiral path over upper and lower shafts of rollers extending transversely across the tanks and functioning to keep the emulsion surface of the film out of contact with the supporting means. Such movement is lacking in the straight through travel of the defendant's film, and a different way is adopted (the recessed rollers or the alternative threading of the film in skewed loops) to maintain the emulsion surface out of contact with the supporting means. Accordingly claim 1 is not infringed.

What has been said above with reference to according a limited construction to the process claim in view of the prior art, is equally applicable to the apparatus claims. Claim 2 requires means, "including rolls at the upper and lower parts of each receptacle," to pass photographic films successively through the several tanks, and specifies that for each tank there shall be "driven feed rolls"; that is, more than one. As shown in the drawings and specifications, the frame provided for each tank includes a shaft on which are mounted two power-driven sprocket rolls. The Warner machine has only one power-driven sprocket for each tank or tube.

This claim also requires that the rolls be arranged to support the film "in a series of loops in each tank, with the emulsion surface outermost." As already indicated, this is accomplished by an arrangement of upper and lower shafts of spools which cause the film to travel in spiral loops transversely across the tanks. In the defendant's machine it is not necessary that the emulsion surface be outermost because the spools are recessed. When the emulsion surface is kept outermost, it is not through any arrangement of the spools but by manually skewing the loops. There is no infringement of claim 2.

Claim 3 requires mechanism controlled from the rupture of the film for controlling the operation of the feeding means. The utility of this claim may well be doubted, for any stoppage of the wet end of the apparatus would result in ruining by overdevelopment all the film in the developing tank. Assuming the claim to be valid, there is no infringement, for the Warner machine has no automatic stop for the wet end. A break of the film in the dryer will stop the feeding means of the drier, but the wet end of the apparatus will continue to operate under its separate motor and to accumulate the film in the "elevator" which intervenes between the wet and dry ends. Claim 3 is not infringed, nor are claims 5 and 6, which also specify the element of automatic stoppage of the feeding means upon rupture of the film.

Claim 4 includes "means for heating the fluid developing solution within the reservoir." This refers to the coil through which hot water may be passed located within the developer reservoir. Gaumont made no discovery that the temperature of the developer must be regulated. That knowledge was old. His disclosure is of a heater located within the reservoir, and we think the District Court was right in limiting the claim to the disclosure. But even if, as the appellant contends, the claim calls for means located anywhere for heating the developer within the reservoir, there is no infringement. In the defendant's apparatus the temperature control is applied after the developer has left the reservoir. The fluid is drawn through a coil where it is heated or cooled by surrounding water, and then delivered to the developing tanks or tubes. There is no heater in the reservoir nor means for heating the fluid within the reservoir. Whichever meaning be ascribed to the claim, it is not infringed.

Claim 15 is specific as to the details of the Gaumont structure. It calls for a series of receptacles, a frame for each of said receptacles, said frame comprising fixed axles, spools mounted loosely on said axles, and a shaft carrying sprocket wheels for engaging a film, and means for driving said shaft. The organization of the Warner machine is dif-

ferent in almost every element. It does not employ a frame for each receptacle, nor have fixed upper and lower axles with spools co-axially mounted on common axles, nor has it sprocket wheels (plural) for each receptacle. This claim is not infringed.

█ The claims of the drier patent which are said to be infringed are 10, 11, 12, 14, 16, and 17.

Claims 10 and 11 cover the same structure as claims 3, 5, and 6 of the first patent. They call for means operated by the breaking of the film for automatically interrupting the action of the driving means. They must be construed in accordance with the disclosure. Hence the driving means refers to the motor which operates both the wet and dry sections of the apparatus, and a rupture of the film in the drier stops both. As previously stated, in the defendant's machine only the drier is stopped. There is no infringement.

Claim 12 is for a drying device for photographic films "comprising means for passing the film or print through the drier in the form of a plurality of loops, said means comprising upper and lower shafts, said lower shafts being supported by the loops of the film." As already explained, Gaumont's structure comprises an upper shaft on which are co-axially mounted a row of spherical rollers and a lower shaft on which are coaxially mounted a row of spherical rollers so arranged as to carry the film through in a transverse spiral path, while the defendant's machine has a stub shaft for each roller; the rollers being parallel and not coaxial, and the film traveling through in a straight line, as was common practise in the prior art. We agree with the court below that the structures are radically different, as is also their operation, and that the claim is not infringed.

Claim 14 calls for a drying chamber having a partition therein, and means for passing the film through the drying device and supplying a current of drying air on each side of the partition. The element of film feeding means in the claimed combination must be construed in accordance with the disclosure of the patent. So construed, the claim is not infringed because of the very different film feeding means of the defendant's apparatus.

The so-called "elevator" of the Warner machine, upon which is accumulated a quantity of film processed in the wet end of the apparatus before it is passed to the drier, is charged as an infringement of claims 16 and 17. Claim 16 is quoted as representative of both: "16. A drying device for photographic

films or prints, comprising means in the drier for carrying forward the film or print, and means for supporting said film in a loop between said means and the point where the film is initially fed to the drying device." Figures 3 and 4 of the patent show the arrangement. There is a single skewed loop of film supported over rollers attached to the outside of the drying cabinet; its purpose, as stated in the specifications, being to compensate for ordinary variations in speed of travel of the film due to endless chain driving connections. In the Warner machine compensation for variation in speed is automatically provided for by its freely floating rollers. Its elevator serves a different purpose and one which the skewed loop of the patent did not purport to, and could not, accomplish. There is not identity of structure, function, or operation between the two. Claims 16 and 17 were correctly held not to be infringed.

For purposes of this appeal we have assumed, without decision, that the several claims in suit are valid. None of them is found to be infringed. On this ground the decree is affirmed, without decision of other questions which have been argued.